IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| Texoma Peanut Company | ) | Case No. 14-81334 |
| Clint-Co Peanut Company, | ) | Case No. 14-81335 |
| Clint Williams Company-Western | ) | Case No. 14-81336 |
| Division | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

## DECLARATION OF ALAN ORTLOFF IN SUPPORT OF FIRST DAY MOTIONS

ALAN ORTLOFF, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the President of Texoma Peanut Company, an Oklahoma corporation ("TPC"), the Vice-President of Clint-Co Peanut Company, an Oklahoma corporation ("CPC") and the President of Clint Williams Company – Western Division LLC, a Texas limited liability company ("CWC") (each, a "Debtor" and collectively, the "Debtors"). In such capacity, I am fully familiar with the Debtors' business, day-to-day operations and financial affairs. I am over 21 years of age and am competent to testify to the matters set forth herein.

2. Pursuant to actions taken by the board of directors of TPC and CPC, and the members of CWC, each Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (title 11 U.S.C. § 101 *et seq.*)[1] on November 5, 2014 (the "Petition Date"). I submit this affidavit in support of the motions and applications seeking relief as of the date hereof more particularly described below (collectively the "First Day Motions"). I have reviewed the First Day Motions or have otherwise had their contents explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations so as to permit an effective transition into chapter 11, preserve and maximize the Debtors' estates and to achieve a successful liquidation of the Debtors' assets. I also believe that, absent access to cash collateral and authority to make certain payments and otherwise continue conducting the Debtors' businesses, the Debtors would suffer immediate and irreparable harm to the detriment of their estates.

3. Except as otherwise indicated, the facts set forth in this Affidavit are based upon my personal knowledge of the Debtors' business operations, my review of relevant records and

---

[1] The CPC bankruptcy case was filed in this Court as Case No. 14-81335 (the "CPC Case"), and the CWC bankruptcy case was filed in this Court as Case No. 14-81336 (the "CWC Case"). The CPC Case and the CWC Case, together with this bankruptcy case of TPC filed as Case No. 14-81334 (the "TPC Case"), are collectively referred to herein as the "Cases", and each of the respective Cases are individually referred to herein as a "Case."

documents, information provided to me or verified by other executives or the Debtors' professional advisors, including its general bankruptcy counsel Crowe & Dunlevy, and/or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financial statements, and the Debtors' industry generally. Unless otherwise indicated, the financial information contained in this Affidavit is unaudited and subject to change. I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

4. TPC was incorporated by Clint Williams in 1961 as a southern Oklahoma bulk peanut drying, handling, and storage operation, buying and storing peanuts for area shellers. In 1968 The Clint Williams Company was established and incorporated as a sheller and processor of peanuts for both seed and edible markets. Although The Clint Williams Company was later merged into TPC, the company continues to do its processed peanut business under the "Clint Williams Company" name which is the name known best in the domestic and international peanut industry. TPC constructed a state-of-the-art custom processing facility that went online in 1993 in which TPC produces company-owned blanched peanuts (skins removed) as well as custom cleaned and/or blanched peanuts for other customers. TPC also produces processed raw shelled and processed raw in-shell peanuts as its main product line sold and shipped all over the world. TPC processes roughly 100,000 tons or more of "farmers' stock" peanuts annually, resulting in annual domestic and international sales of over $100 million. As of the Petition Date the Debtors collectively employ 333 people.

5. TPC owns 100% of CPC and 99% of CWC. CPC and CWC own improved real property used as "buying points." Between them, Debtors own 15 buying points and storage facilities – 4 in Oklahoma, 9 in Texas, and 2 in Mississippi. They also lease three commissioned buying and storage points, one each in Oklahoma, Texas, and Arkansas. Peanut growers deliver their "farmers stock" (harvested peanuts) to these buying points, where the farmers stock is received, dried, graded, and stored prior to delivery to the TPC processing facility in Madill, OK. All processing (shelling, in-shell processing, and blanching/cleaning is done in Madill, OK.

6. As described in detail below, the Cases were filed primarily because the Debtors' gross profit decreased 136% from fiscal year[2] 2012 ($12.237 million gross profit) to fiscal year 2013 ($4.423 million gross loss). The fiscal year 2013 loss caused the Debtors to default on their commercial loan obligations with Wells Fargo Bank, National Association ("Wells Fargo") and Great Western Bank ("Great Western").

7. The Debtors have determined that an orderly liquidation of their assets, on a going-concern basis, will maximize the return to holders of secured and unsecured claims against the Debtors, and the Debtors' equity security holders.

---

[2] Each Debtor's' fiscal year is September 1 – August 31.

8. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their properties and assets as debtors-in-possession. No trustee, examiner or committee has been appointed in the Debtors' Chapter 11 cases.

## BACKGROUND

### A. The Wells Fargo Credit Agreement

9. The Debtors are indebted to Wells Fargo and granted security as evidenced by certain instruments, agreements and documents including, without limitation, (a) that certain Second Amended and Restated Credit Agreement dated January 15, 2014, as amended by the First Amendment to Amended and Restated Credit Agreement dated February 5, 2014, the Second Amendment to Amended and Restated Credit Agreement dated February 24, 2014, and the Third Amendment to Amended and Restated Credit Agreement dated June 2, 2014 (as amended, the "Wells Fargo Credit Agreement"), (b) that certain Second Amended and Restated Revolving Line of Credit Note dated January 15, 2014 in the face amount of $71,500,000 (the "Wells Fargo Note"), such Wells Fargo Note having been executed by Debtors and made payable to the order of Wells Fargo, (c) that certain Second Amended and Restated Security Agreement dated January 15, 2014 in favor of Wells Fargo (the "Wells Fargo Borrower Security Agreement"); such indebtedness being secured by perfected, first priority security interests in and liens against virtually all of the Debtors' real and personal property interests and certain property of certain guarantors (collectively, the "Wells Fargo Collateral"). Events of Default have occurred under Section 8.01(a) of the Wells Fargo Credit Agreement.[3]

### B. The Great Western Loan and Security Agreement

10. The Debtors were indebted to Great Western under a certain (a) Loan and Security Agreement dated January 20, 2010, as amended by First Amendment to Loan and Security Agreement made as of August 27, 2012 (as amended, the "Great Western Loan Agreement"), and (b) that certain Term Note dated August 27, 2012 in the face amount of $12,000,000 (the "Great Western Note"), such indebtedness being secured by a mortgage lien against TPC's Madill, OK processing plant (the "Madill Plant") and a security interest in TPC's equipment located in the Madill Plant (the "Madill Equipment," and together with the Madill Plant, the "Great Western Collateral"). The Great Western Collateral was sold by TPC to Golden Peanut Company, LLC ("Golden") in an arms-length sale closed on November 4, 2014 for a sum sufficient to effectively eliminate 100% of the total debt of approximately $11,000,000.00 owed under the Great Western Loan Agreement (the "Great Western Sales Price"). As a result of such sale, the Debtors and Great Western entered into a settlement agreement (The "Great Western Settlement Agreement") pursuant to which, among other

---

[3] The Debtors also are parties to an equipment lease with a Wells Fargo affiliate, Wells Fargo Equipment Financing, Inc. ("WFEFI"), which equipment has been or will be described in the Debtors' schedules filed in this Case. As used herein, "Wells Fargo Collateral" includes the equipment covered by that equipment lease.

things, Great Western released all liens and security interests in the Great Western Collateral, and provided TPC a covenant not to sue (or to file a proof of claim against the Debtors) with respect to the unpaid balance of the Great Western Note.[4] At the same time, Golden leased back to the Debtors the Great Western Collateral under a lease that expires on the earlier of 21 days after the last sale of the Debtors' remaining assets or January 28, 2015.

C. **Fiscal Year 2013 Loss**

11. The large fiscal year 2013 loss was driven almost entirely by losses associated with operating the Debtors' Mississippi buying point locations. For the previous two years the Debtors had been working with a small number of farmers in the northeastern area of Arkansas in anticipation of a full peanut buying and storage facility for the 2012 crop (FYE 2013). The debtors were also looking into the commercial growing of peanuts in the Mississippi area as well. The Debtors were looking in to building a buying point in Mississippi in order to enter that market and to maximize the volume of tonnage processed in the Madill Plant. Upon the recommendation of one of their Arkansas farmers, the Debtors employed an area manager for its Mississippi operations who Debtors later found had grossly misrepresented his qualifications and experience. The area manager committed the Debtors to purchase the peanut production from more than twice the amount of acres that he had been authorized to purchase, at prices well in excess of prevailing market rates. The purchase of excess tonnage resulted in Debtors building two buying points, rather than the one they had originally planned. The Madill Plant was not capable of processing the excess, unauthorized tonnage of farmers stock purchased. Over-purchasing farmers stock at in excess of market price resulted in an overpayment of approximately $100 per ton for the Mississippi farmers stock, at a nearly $4.7 million loss. The now-terminated area manager's failure to supervise and manage the Debtors' operations in accordance with industry standards caused the Debtors to incur nearly $500,000 of excess processing costs associated with the Mississippi farmers stock, and "shrinkage" (unaccounted-for or missing inventory) at the Mississippi buying points of nearly $6 million in value (over six times the average historical shrinkage rate at the Debtors' existing buying points). As noted above, as a result of the losses incurred related to the Debtors' Mississippi operations, the Debtors defaulted under the Wells Fargo and Great Western credit facilities.

## FIRST-DAY MOTIONS

12. On or after the Petition Date, the Debtors filed the following motions (collectively referred to herein as the "First Day Motions"):

---

[4] The referenced covenant not to sue is terminable in the event (a) Great Western is sued for any reason related to the Great Western Loan Agreement or any document or instrument executed pursuant thereto; the Great Western Settlement Agreement is rescinded or rendered void for any reason; the Debtors' releases of Great Western and/or its affiliates effected by the Great Western Settlement Agreement are rescinded or rendered void for any reason; or if all or any portion of the Great Western Sales Price is forced to be repaid in a preference, fraudulent transfer or other action brought by any of the Debtors or any party claiming by or through them, including the Debtors as debtors-in-possession or a bankruptcy trustee.

A.  *MOTION FOR JOINT ADMINISTRATION.*  Through this motion, the Debtors seek to jointly administer the estates of the respective Debtors under the case number of and for the case of Texoma Peanut Company (14-81334) for all purposes other than for the filing of claims against CPC and CWC (the Debtors propose that claims be filed against CPC and CWC under their respective case numbers). Joint administration of the three estates is appropriate because the Debtors collectively (i) share common management, (ii) operate as a single business operation, and (iii) plan to sell all of their core business assets under one sale procedure.

B.  *MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363 AND 507, (I) AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS AND RELATED AMOUNTS, (II) CONFIRMING RIGHT OF DEBTORS TO CONTINUE EMPLOYEE PROGRAMS ON POST PETITION BASIS, (III) CONFIRMING RIGHT OF DEBTORS TO PAY WITHHOLDING AND PAYROLL-RELATED TAXES AND (IV) DIRECTING BANKS TO HONOR PREPETITION CHECKS FOR EMPLOYEE OBLIGATIONS.*  Through this motion, the Debtors seek an order of this Court (i) authorizing Debtors to pay or otherwise honor pre-Petition Date obligations to current employees for salaries and other compensation and benefits under all plans, programs and policies implemented by the Debtors prior to the Petition Date (defined in the motion as "Prepetition Employee Obligations"); (ii) confirming Debtors' right to continue the "Employee Programs" (as defined in the motion), which includes payment of salaries; reimbursement of reasonable expenses incurred by employees in performing their jobs, including, but not limited to, business-related travel, automobile expenses, lodging and meals (defined in the motion as "Reimbursable Expenses") on both pre- and post-petition bases; provision of insurance and 401(k) savings plans defined as "Benefits" in the motion on a post-petition basis, and to pay all amounts owed by the Debtors for expenses and fees relating to Benefits incurred prior to the Petition Date; paid time off benefits; and worker's compensation programs; (iii) confirming that the Debtors are permitted to deduct and pay any and all local, state and federal withholding and payroll related or similar taxes or obligations relating to both pre- and post-petition periods (defined in the motion as "Employer Payroll Taxes" and "Deductions"); (iv) authorizing the Debtors to pay any prepetition claims owing to the payroll administrator used by the Debtors; and (v) directing all banks to honor prepetition checks for payment of the Prepetition Employee Obligations. The continued service and dedication of the Debtors' employees is critical to the Debtors to maintain the going-concern value of their respective assets as the Debtors proceed in this case to sell those assets. The Debtors' operations require employees with a high level of skill and experience with the Debtors' plant, property and equipment; sales; finance; and other components of the Debtors' operations. Marshall County, Oklahoma has an extremely low unemployment rate and offers employment opportunities comparable to those offered by the Debtors at comparable wage and benefit packages. Failure to pay pre-petition employee obligations, or to continue to honor existing employee wage and benefit programs post-petition, likely would result in the Debtors' employees seeking employment at other local employers. The Debtors' have reduced their staffing in recent months to maintain the lowest possible payroll consistent with prudent business operations. The loss of any significant number of existing

employees could have a devastating effect on the Debtors' operations, and consequently on the Debtors' ability to sell their assets at the highest possible price.

C. *MOTION UNDER 11 U.S.C. §§ 105(A) AND 331 TO ESTABLISH PROCEDURES FOR THE INTERIM COMPENSATION OF PROFESSIONALS.* Through this Motion, the Debtors seek approval of a procedure providing for the interim compensation of court-approved professionals on a monthly basis post-petition on a calendar month basis. The proposed procedure will (i) enable all interested parties to monitor the costs of administration; (ii) allow professionals to receive interim compensation; and (iii) allow the Debtor to better manage its cash flow. The Debtors believe this motion should be granted in order to facilitate the Debtors' retention of the most qualified professionals to assist in the sale of the Debtors' assets and the administration of the Debtors' estates.

D. As of the Petition Date, Debtors maintain twenty-one (21) bank accounts (listed and described on Exhibit "A" of the motion and collectively referred to therein and herein as the "<u>Bank Accounts</u>"). I am informed, and therefore believe, that all of the Bank Accounts are in financially stable banking institutions. The Bank Accounts are part of the Cash Management System that ensures the Debtors' ability to efficiently monitor and control all of their cash. The Debtors believe that their existing Cash Management System provides a cost-effective and efficient means of managing the Debtors' finances and the maintenance of such a system will benefit all creditors by reducing day-to-day operating expenses of the Debtors' estates. The requirement that the Debtors close all existing and open all new accounts would disrupt the Debtors' operations and result in delays in payments to employees, customers and creditors thereby impeding the Debtors' ability to transition into Chapter 11 as smoothly as possible, and further impeding the Debtor's ability to sell their assets as a going concern. The Debtors submit that failure to continue the Cash Management System would disrupt the Debtors' operations and impose a financial burden on the estates, while providing little or no benefit to the Debtors' estates and creditors. Any payments that are received in the Debtors' accounts will be treated as Wells Fargo's cash collateral and the Debtors shall be allowed to use such amounts only by agreement of Wells Fargo or order of this Court. The Debtors believe that this system will substantially comply with the Office of the United States Trustee's operating guidelines and provide Wells Fargo with all of the protections of its cash collateral that it is entitled to under the Bankruptcy Code given that the Debtors will be permitted to use the cash in the Bank Accounts only if Wells Fargo consents or is adequately protected pursuant to §§ 363 and 361.[5]

    i. In order to minimize expenses to their estates, the Debtors plan to continue to use all correspondence, business forms and checks existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession. As a result of the notices sent by the Debtors, and the size of and publicity surrounding these cases, parties doing business with the Debtors

---

[5] The Debtors have filed concurrently herewith an Expedited Motion to Incur Debtor-in-Possession Financing and use Cash Collateral.

undoubtedly will be aware of the Debtors' status as Chapter 11 debtors-in-possession. Changing checks, correspondence and business forms would be expensive and burdensome to the Debtors and disruptive to the Debtors' business operations and would provide little real benefit to the parties with whom the Debtors do business. Debtors therefore request that they be authorized to use existing checks and business forms without being required to place the label "debtor-in-possession" on each.

   ii. As stated above, the Debtors Cash Management System that ensures the ability of the Debtors to monitor and control all of their cash. Accordingly, in order to avoid disruption of their operations and ensure an orderly transition into Chapter 11, the Debtors plan to continue to use their existing Cash Management System (as it may be modified by the Debtors in the ordinary course of business). The Debtors Cash Management System is centrally administered and includes, among other things, centralized forecasting, reporting, fund collection and funds disbursement functions. The principal components of the system are accurately described in paragraph 17 of this motion. The Cash Management System procedures the Debtors use constitutes ordinary, usual and essential business practice consistent with those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to (a) trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable; (b) control corporate funds centrally; (c) minimize idle cash; and (d) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance presentment information. As stated above, requiring the Debtors to adopt new, segmented cash management systems would be expensive and disruptive to the Debtors' Chapter 11 efforts generally, and specifically disruptive to the Debtors' efforts to market their assets as a going concern.. Consequently, maintenance of the existing Cash Management System during these Chapter 11 cases is in the best interest of all the Debtors, their estates and the creditors.

   iii. I have been informed that the cash sweep implemented pursuant to the Debtors' Cash Management System likely complies with § 345 of the Bankruptcy Code. Nevertheless, to the extent that it may not comply with § 345 or any other requirements of the United States Trustee, the Debtors request that this Court waive any such noncompliance, because the Debtors' cash sweep system is designed to protect the principal invested while maximizing liquidity and generating a reasonable return at minimal expense to the Debtors.

   iv. The individual Debtors regularly engage in intercompany financial transactions in the ordinary course of their respective businesses with each other. All intercompany transactions are reflected as discrete transfers in the appropriate intercompany accounts. The transactions are primarily between TPC and Clint-Co. TPC covers payroll each month for CPC and CWC and funds other trade transactions as needed. There are no intercompany transfers between Clint

Williams and Clint-Co. I anticipate that the intercompany transactions will continue following the Petition Date. I am informed that because the Debtors engaged in the intercompany transactions on a regular basis before the Petition Date and such transactions are common for enterprises like the Debtors, the intercompany transactions are ordinary course, within the meaning of § 363(c)(1) and §364(a) of the Bankruptcy Code, and thus do not require this Court's approval. The intercompany transactions are capable of being, and are, monitored and accounted for by the Debtors' cash management system. The intercompany transactions are necessary as being the most expeditious and cost-effective means of implementing the transactions in question. To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors will continue to maintain records of such transfers, including records of all current intercompany accounts receivable and payable, with balances existing as of the Petition Date. Accordingly, I believe that the continuation of the intercompany transactions is in the best interests of the Debtors' estates and creditors.

v. Debtors have agreed with the United States Trustee and plan to continue their prior practices that each of the Debtors' Banks to debit the Debtors' accounts in the ordinary course of business without the need for further order of this Court for: (i) all checks drawn on the Debtors' accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of the Debtors' account with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for such items prior to the Petition Date; and (iii) all undisputed pre-petition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System. Debtors further request that: (iv) those certain existing deposit agreements between the Debtors and their existing depository and disbursement banks (collectively referred to in the motion and herein as the "Banks") shall continue to govern the post-petition cash management relationship between the Debtors and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect, and (v) the Debtors and the Banks may, without further Order of this Court, agree to and implement changes to the cash management systems and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts. These provisions are critical to maintaining the Debtors' Cash Management System and banking relationships with the Banks that are integral to that system. As stated above, maintenance of the Debtors' Cash Management System will significantly aid the Debtors' efforts to market their assets as a going concern. Consequently, the relief requested in this paragraph is in the best interest of all the Debtors, their estates and the creditors.

E. *MOTION FOR INTERIM AND FINAL ORDERS PROVIDING ADEQUATE ASSURANCE OF UTILITY PAYMENTS.* By this motion, the Debtors seek entry of interim and final orders (i) prohibiting utility companies from altering, refusing, or discontinuing services to the Debtors; (ii) authorizing and approving the amount and method by which the Debtors may furnish certain utilities with adequate assurance of payment for post-petition utility services and directing the utilities to continue providing such services pending entry of a final order on the motion; and (iii) scheduling a final hearing on the motion within 30 days of the Petition Date. Uninterrupted utility service is critical to the ability of the Debtors to operate, to maintain the value of their businesses, to maximize value for the benefit of the estates and their creditors, and to market the Debtors' assets as a going concern. The Debtors could not operate their businesses without utility service. Should any Utility refuse or discontinue service, the Debtors could be forced to cease or limit operations, thereby irreparably harming the Debtors, their estates and creditors. The Debtors have made a good-faith effort to identify all utility companies that provide service to the Debtors, and will supplement the "Utility Service List" (as defined in the motion) as and when additional utility service providers are identified.

F. *MOTION FOR ORDER GRANTING ADDITIONAL TIME TO FILE SCHEDULES AND STATEMENTS PURSUANT TO 11 U.S.C. § 521(a)(1) AND FED. R. BANKR. P. 1007(b).* By this motion, the Debtors seek an order extending the deadline to file their respective schedules and statements of financial affairs required by 11 U.S.C. § 521(a)(1) and Fed. R. Bankr. P. 1007(b) (collectively referred to in the motion and herein as the "Schedules and Statements") for an additional 14 days, thereby granting them a total of 28 days from the Petition Date, to and including December 3, 2014 to accomplish such filing. The Debtors have a substantial number of creditors and parties in interest and conduct their business operations from several locations in the United States. Given the size and complexity of their businesses, and due to the voluminous nature of the information required to be gathered, the Debtors have not had the opportunity to prepare their respective Schedules and Statements. To prepare the Schedules and Statements, the Debtors must obtain information from books, records and documents relating to hundreds of transactions. This information is located in various offices in the United States. Consequently, completion of the Schedules and Statements will require an expenditure of a significant amount of time and effort by the Debtors' employees, many of whom have been and will continue to be simultaneously working on other aspects of the Debtors' efforts to sell their assets as a going concern and endeavoring to stabilize operations by addressing the myriad of employee, customer and vendor issues raised by the filing.

G. *MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO FILE A CONSOLIDATED CREDITOR MATRIX AND (II) GRANTING AUTHORITY TO ESTABLISH THE MASTER SERVICE LIST APPLICABLE TO THESE CASES.* By this motion, the Debtors seek authority to (i) file a consolidated creditor matrix, and (ii) establish the master service list to be used in these cases (defined in the motion and herein as the "Master Service List"). Requiring each of the Debtors to file a separate creditor matrix in each of their respective cases would be unduly burdensome and duplicative. Most, if not all, of the creditors will be creditors of TPC, with only a

handful of creditors existing for the other Debtors. Therefore, it is in the best interest of the Debtors' estates to avoid the cost associated with preparing separate matrices. Accordingly, I believe that filing a single, consolidated creditor matrix in these cases is in the best interests of the Debtors' respective estates and will facilitate the efficient and orderly administration of these cases.

    H. *MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) APPROVING POST- PETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 363 AND 364, (D) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION LENDER, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF.* By this motion, the Debtors seek orders of this Court on interim and final bases:

- authorizing the Debtors to obtain post-petition loans and other extensions of credit from Wells Fargo Bank, N.A. ("Lender") in an amount not to exceed $12,700,000 on an interim basis, and $40,500,000 on a final basis, cumulative of any amounts advanced on an interim basis (the "DIP Commitment"), and including, without limitation, principal, other extensions of credit and financial accommodations, interest, fees, expenses, and other costs of Lender in the Cases, in accordance with the terms and conditions set forth in the proposed interim order granting the motion (the "Proposed Interim Order") and in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (the "DIP Agreement") attached to the Proposed Interim Order, the other Loan Documents (as defined in the DIP Agreement), and all other related agreements and documents (collectively, the "DIP Facility");

- authorizing the Debtors to execute, deliver, and perform under the DIP Facility and Loan Documents, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the Lender on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of Lender on account of the DIP Facility, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among any of the Debtors and Lender, (collectively, the "DIP Facility Documents");

- approving the terms and conditions of the DIP Facility and the DIP Facility Documents;

- upon entry of a final order, approving the Lender Pre-Petition Claim (as defined in the Proposed Interim Order), including, without limitation, all outstanding letters of credit previously issued by Lender at the request of Debtors as applicants, being deemed obligations and indebtedness to Lender under the DIP Facility (all obligations and indebtedness to Lender under the DIP Facility Documents, collectively, the "DIP Obligations") and secured by the DIP Collateral (as defined in the Proposed Interim

Order);

- authorizing the Debtors to use Cash Collateral (as defined in the Proposed Interim Order) of Lender in accordance with the terms and conditions set forth in the Proposed Interim Order;

- modifying the automatic stay of Bankruptcy Code § 362 (the "Automatic Stay") to the extent provided in the Proposed Interim Order;

- granting of automatically perfected first priority liens and security interests to Lender to secure the DIP Obligations, and granting liens, security interests, and other adequate protection to Lender and WFEFI with respect to their interests in the DIP Collateral and the Prepetition Collateral (as defined in the Proposed Interim Order);

- authorizing the indefeasible transfer of Cash Collateral to and for the benefit of Lender as set forth in the Proposed Interim Order; and

- authorizing and approving the terms, provisions, and agreements set forth in the Schedule of Sale Process Items attached to the Proposed Interim hereto as **Exhibit 3**.

  i. The Debtors and Wells Fargo have negotiated the Proposed Interim Order at arm's-length and have acted in good faith in the negotiation and preparation of the Proposed Interim Order, have been represented by counsel, and intend to be bound by its terms. I believe, and therefore state, that the terms and conditions of the Proposed Interim Order reflect the Debtors' exercise of prudent business judgment under exigent circumstances and are consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

  ii. The Debtors' stipulations, allegations and agreements set forth in the subject motion at and in the Proposed Interim Order at are accurate and reflect my beliefs and the Debtors' agreements. The relief proposed to be granted in the Proposed Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates because, without the use of Cash Collateral and receipt of the DIP Facility, the Debtors will not have the funds necessary to maintain their assets, sell or otherwise liquidate their assets, provide financial information, and pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates. The Debtors require the use of Cash Collateral and receipt of the DIP Facility as provided in the Proposed Interim Order.

  iii. The DIP Facility is conditioned upon the Debtors conducting a comprehensive marketing and sale process of their assets and businesses in accordance with each of the "Sale Milestones" defined and described in the Schedule of Sale Process Items attached as **Exhibit 3** to the Proposed Interim Order. The Sale Milestones and other terms set forth in the Schedule of Sale Process Items are reasonable and appropriate under the circumstances. The Debtors have actively marketed their assets for several months prior to the Petition Date through a qualified and experienced nationally-recognized broker. The marketing of the Debtors' assets resulted in a pre-petition sale of

the Great Western Collateral to Golden, but the Debtors received no bids for the Wells Fargo collateral in an amount sufficient to fully pay all sums secured by the Wells Fargo Collateral. The Schedule of Sale Process Items contemplates a further marketing of the Wells Fargo Collateral post-petition, and an auction sale of the Wells Fargo Collateral subject to the right of Wells Fargo and WFEFI to credit bid on any individual asset, portion of the assets, or all assets constituting their respective Collateral. Because Debtors' require the DIP Facility and use of Cash Collateral to operate the Wells Fargo Collateral, the bid procedures contained in the Schedule of Sale Process Items constitute the most efficient and economical method of marketing the Wells Fargo Collateral as a going concern, thereby maximizing the potential sale price of such assets.

I. *MOTION FOR ORDER PURSUANT TO 11 U.S.C. § 105 AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CRITICAL TRADE CREDITORS.* By this motion, the Debtors request authority to pay, in their discretion, prepetition Trade Claims (as defined in the motion) of the Critical Trade Creditors (as defined in the motion and listed on Exhibit "1" thereto) in accordance with the terms contained in the motion. Debtors have carefully analyzed the available suppliers and vendors and have determined the suppliers and vendors that are critical and necessary to the continued operation of Debtors' businesses based on the goods and services supplied and the availability of other sources of supply of similar cost and quality. Debtors estimate that the maximum amount of prepetition Trade Claims to be paid pursuant to the motion is approximately $3,100,000.00 million, which represents only a small fraction of Debtors' estimated total liabilities as of the Petition Date of $45,000,000.00. The relief requested in the motion, if granted, will enable Debtors to continue to receive, on ordinary trade credit terms, the essential goods and services that are the lifeblood of its business and permit it to preserve its going concern value. Some of the Critical Trade Creditors may assert reclamation rights under § 546 of the Bankruptcy Code. The relief requested in this Motion is intended to avoid uncertainty and litigation over such issues. The Debtors propose to condition payment of Critical Trade Creditors Trade Claims as described in paragraphs 8-10 of the motion. The allegations made in this Motion are accurate and reflect my beliefs and the Debtors' beliefs.

13. For the reasons stated above, I believe that each of the First Day Motions seeks relief that is critical to the success of the Cases and of the Debtors' efforts to market their assets as a going concern.

14. I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 5, 2014.

_____     _____
                                                        ALAN ORTLOFF

OFFICIAL SEAL
DAVID R. TERRY
NOTARY PUBLIC OKLAHOMA
MARSHALL COUNTY
COMM. NO. 12000288 EXP. 01-10-16