**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | ) | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | |
| Texoma Peanut Company | ) | Case No. 14-81334 |
| Clint-Co Peanut Company | ) | Case No. 14-81335 |
| Clint Williams Company-Western Division LLC | ) | Case No. 14-81335 |
| Debtors. | ) | |
| | ) | Jointly Administered |

**DEBTORS' APPLICATION TO EMPLOY AND RETAIN LAKESHORE FOOD
ADVISORS, LLC AS THEIR SALE ADVISOR PURSUANT TO SECTIONS 327 AND
328(a) OF THE BANKRUPTCY CODE**

Debtors and debtors-in-possession Texoma Peanut Company, Clint-Co Peanut Company and Clint Williams Company-Western Division LLC (collectively "Debtors"), pursuant to 11 U.S.C. §§327 and 328(a), Federal Rule of Bankruptcy Procedure 2014 and Rule 2014-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Oklahoma, hereby respectfully request this Court enter an order authorizing the employment and retention of Lakeshore Food Advisors, LLC ("Lakeshore"), as sale advisor for Debtors. In support of this Application, Debtors reply upon and incorporate by reference the Declaration of Mary L. Burke in Support of Application to Employ Lakeshore Food Advisors, LLC for Debtors, attached hereto as Exhibit "1". In further support of this Application, Debtors state as follows:

**JURISDICTION AND STATUTORY PREDICATE**

1.      This court has jurisdiction of this Application pursuant to 28 U.S.C. §§ 157[1] and 1334. Venue of these cases and this application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]All references to sections or codes, unless otherwise noted, are made to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and referred to herein as the "Bankruptcy Code."

2610375.6

2. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 327(a) and 328(a).

## BACKGROUND

3. On November 6, 2014, Debtors filed their voluntary petitions for relief under chapter 11 the Bankruptcy Code. Immediately thereafter, Debtors moved to administratively consolidate their three bankruptcy cases.

4. Debtors continue in possession of their assets and the management of their businesses as a debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The U. S. Trustee has not yet appointed any official committees in these cases, and no request has been made for the appointment of a trustee or examiner.

5. A description of the Debtors' businesses, the reasons for filing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 is set forth in the Declaration of Alan Ortloff, President of Texoma Peanut Company *et al*., in Support of TPC's Chapter 11 Petitions and First Day Motions, sworn to on November 5, 2014 (the "First Day Declaration"). Debtors hereby adopt and incorporate the First Day Declaration as if fully set forth herein.

## RELIEF REQUESTED

6. Debtors request that the Court enter an order authorizing Debtors to employ and retain Lakeshore serve as their sale advisor in these cases.

7. Capitalized terms not defined herein shall have the meanings ascribed to them in the Services Agreement (as defined below).

2

8.      As further set forth in the Financial Advisory Services Agreement, dated August 15, 2014 (as may be amended, "Services Agreement"), attached hereto as Exhibit "2", if this Application is approved, the professional services Lakeshore may render to Debtors may include, without limitation, the following:

A.      Assist and advise Debtors in developing a strategy for accomplishing the sale of Debtors' peanut processing business and related operations.

B.      Advise Debtors in developing a list of prospective Buyers after considering the qualitative and quantitative characteristics of such parties and evaluating each such party against the strategic and financial objectives of the Debtors.

C.      Assist Debtors in preparing an information packet for distribution to prospective Buyers.

D.      Contact prospective Buyers.

E.      Provide Debtors with written progress reports regarding the status of the Transaction.

F.      Facilitate and respond to questions raised by prospective Buyers.

G.      Assist Debtors in reviewing, preparing and presenting information and attend meetings and conference calls with prospective Buyers.

H.      Coordinate and supervise due diligence by prospective Buyers.

I.      Assist Debtors in evaluating proposals from prospective Buyers.

3

2610375.6

J.     Assist Debtors in reviewing, structuring, negotiating, and executing all Transaction related agreements with prospective Buyers.

K.     Assist Debtors in closing the Transaction.

9.     Such professional services are necessary in the ongoing operation and management of the Debtors' business and assets as well as to the Debtors' restructuring efforts under chapter 11 of the Bankruptcy Code.  *See* Exh. "1".

10.     The Debtors believe that Lakeshore is well qualified to provide services as sale advisor to the Debtors in a cost-effective, efficient and timely manner.  Lakeshore has indicated a willingness to subject itself to the jurisdiction and supervision of the Court.  *See id.*

## BASIS FOR RELIEF

11.     Section 327(a) authorizes debtors to employ professionals who do not represent any interest adverse to a debtor's estate and who are "disinterested person[s]."  A "disinterested person" is one who is "not a creditor, an equity security holder, or an insider; is not and was not within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or for any other reason."  11 U.S.C. §101(14)(a)-(c).  A professional is not disqualified for employment under section 327 solely because of such professional's employment by or representation of the debtor before the commencement of the chapter 11 case.  *See* 11 U.S.C. § 1107(a).

## QUALIFICATIONS

4

12.     Lakeshore is well qualified to assist the Debtors in this matter.  Lakeshore has considerable experience in providing services to financially troubled companies in the food and agribusiness industry.  Lakeshore provides a full range of investment banking and financial advisory services to such companies including mergers and acquisitions; raising capital, debt and equity; valuation work; and restructuring and bankruptcy.  *See* Exh. "1".

13.     Lakeshore and its professionals have extensive experience providing financial advisory and investment banking services to financially distressed food and agribusiness companies and to creditors, equity holders, asset purchasers, and other constituents in reorganization proceedings and complex financial restructurings, both in and out of court.  *See id.*

14.     Lakeshore was initially retained by Debtors on or about August 15, 2014 to provide various financial and consulting services including assisting the Debtors evaluate the Debtors' businesses for potential sale as going concerns and identifying potential purchasers.  Lakeshore obtained a detailed familiarity with the Debtors' business, capital structure, and financial affairs and played a significant role in the Debtors' prepetition restructuring efforts and preparation of these cases.  As such, Lakeshore has the necessary breadth and depth of institutional knowledge that has made and will continue to make this engagement more efficient and effective.  *See id.*

15.     Based upon Lakeshore's qualifications and experience, Debtors respectfully submit that Lakeshore's employment and retention as sale advisor in these chapter 11 cases is in the best interest of the Debtors' estates, their creditors and other parties-in-interest.

2610375.6

## LAKESHORE HOLDS NO DISQUALIFYING ADVERSE INTEREST AND IS "DISINTERESTED" AS THAT TERM IS DEFINED BY THE BANKRUPTCY CODE

16.     Lakeshore has informed the Debtors that, except as set forth in Exhibit "1", Lakeshore (a) has no connection with the Debtors, their creditors, equity security holders, or other parties-in-interest or their respective attorneys or accountants, the United States Trustee for the Eastern District of Oklahoma ("U.S. Trustee"), or any person employed in the office of the U.S. Trustee in any matter related to the Debtors or their estates, (b) does not hold any interest adverse to the Debtors' estates and (c) believes that it is a "disinterested person" as that term is defined in section 101(4), as modified by section 1107(b) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code.

## PROFESSIONAL COMPENSATION

17.     Subject to the Court's approval, Debtors will compensate Lakeshore in accordance with the terms and conditions and at the times set forth in the Services Agreement, which provides in relevant part for the following compensation structure ("Fee Structure"):

A.     Debtors paid Lakeshore a non-refundable fee of $125,000.00 upon execution of the Services Agreement.  As indicated on Exhibit "1", this amount was exhausted prior to the filing of these chapter 11 cases.

B.     Debtors have agreed to pay Lakeshore a Success Fee according to the terms set forth in the Services Agreement.

C.     Debtors have agreed to pay Lakeshore a DIP Success Fee in the event Lakeshore provides DIP Financing Services in connection with these chapter 11 cases according to the terms set forth in the Services Agreement.

2610375.6

D.      Debtors have agreed to pay Lakeshore a Tail Fee according to the terms set forth in the Services Agreement.

18.     Debtors have agreed to reimburse Lakeshore on a monthly basis for all reasonable expenses incurred in connection with providing the services set forth in the Services Agreement. Such reimbursements shall be made pursuant to the terms of an order of the Court approving interim compensation procedures for professionals and pursuant to other orders of the Court.

19.     Debtors believe that the Fee Structure is comparable to compensation generally charged by investment banking and financial advisory firms of similar stature to Lakeshore for comparable engagements, both in and out of bankruptcy. Debtors believe that the Fee Structure is consistent with Lakeshore's normal and customary billing practices for cases of comparable size and complexity that require the level and scope of services to be provided in these chapter 11 cases.

20.     Denying the relief requested herein would deprive the Debtors of the assistance of a highly qualified investment banker and financial advisor such as Lakeshore and disadvantage the Debtors and all parties-in-interest. Debtors would be forced to engage a new investment banker and financial advisor to act as sale advisor who would lack Lakeshore's understanding of the Debtors' business and restructuring initiatives and who would lack Lakeshore's expertise in the food and agribusiness industries. Forcing the Debtors to engage a new sale advisor would also require additional time and resources at this critical time when the Debtors' time and resources should be concentrated on increasing the value of the estates for the benefit of creditors.

2610375.6

21.     The Debtors seek approval of the Services Agreement, including the Fee Structure contained therein, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code. Section 328(a) provides, in relevant part, that the Debtors, "with the court's approval, may employ or authorize the employment of a professional under section 327 … on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage basis, or on a contingent fee basis." 11 U.S.C. 328(a). Accordingly, section 328(a) permits the compensation of professionals, including investment bankers and financial advisors, on flexible terms that reflect the nature of their services and prevailing market conditions for those services.

22.     Notwithstanding approval of its employment and retention under section 328 of the Bankruptcy Code, Lakeshore will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court, and the fee guidelines established by the U.S. Trustee, as those procedures may be modified or supplemented by the Court.

## INDEMNIFICATION

23.     Lakeshore requests that the indemnification and limitation of damages provisions of the Services Agreement be approved, subject to the following:

A.     Notwithstanding any provision of the Services Agreement to the contrary, the Debtors shall have no obligation to indemnify Lakeshore, or provide contribution or reimbursement to Lakeshore, for any claim or expense that is (i) unrelated to services provided by Lakeshore pursuant to the Services Agreement or pursuant to an order of the Court, (ii) judicially determined (the determination having become final) to have arisen

8

2610375.6

from Lakeshore's gross negligence or willful misconduct, (iii) for a contractual dispute in which the Debtors allege the breach of Lakeshore's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Company, et al.*, 315 F.3d 217 (3d Cir. 2003); or (iv) settled prior to a judicial determination as to Lakeshore's gross negligence or willful misconduct, but determined by this Court, after notice and a hearing, to be a claim or expense for which Lakeshore should not receive indemnity, contribution or reimbursement under the terms of the Services Agreement, as modified by this Order; and;

B.      If, before the earlier of (i) the entry of an order confirming a Chapter 11 plan in the Debtors' cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing this Chapter 11 case, Lakeshore believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Services Agreement (as modified by an order of the Court), including without limitation the advancement of defense costs, Lakeshore must file an application therefore in this Court, and the Debtors may not pay any such amounts to Lakeshore before the entry of an order by this Court approving the payment. Such payments shall not be made with funds constituting the cash collateral of the Debtors' secured lenders. This subparagraph B is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Lakeshore for indemnification, contribution or reimbursement and not a provision limiting the duration of the Debtors' obligation to indemnify Lakeshore, and

2610375.6

C.    In the event Lakeshore seeks reimbursement for attorneys' fees from the Debtors, the invoices and supporting time records from such attorneys shall be annexed to the application for indemnification filed with this Court, and such invoices and time records shall be subject to the U.S. Trustee's guidelines for compensation and reimbursement of expenses and the approval of this Court under the standards of section 330 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code.

## NOTICE

24.    Notice of this Application has been provided to: (a) the Office of the United States Trustee for the Eastern District of Oklahoma; (b) those entities or individuals listed on the Debtors' lists of their twenty largest unsecured creditors; (c) all secured creditors and their counsel (if known); (d) all applicable state and local taxing authorities; and (e) the parties in interest who have formally requested notice by filing a written request for notice pursuant to FED. R. BANKR. P. 2002 and the local bankruptcy rules.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, Debtors respectfully request this Court to approve its employment of Lakeshore Food Advisors, LLC on the terms described herein in accordance with 11 U.S.C. § 327(a).

Respectfully submitted,

/s/ Michael R. Pacewicz
Mark A. Craige, OBA #1992
Michael R. Pacewicz, #18794
500 Kennedy Building
321 South Boston Avenue

10

Tulsa, Oklahoma 74103-3313
918.592.9800 Telephone Number
918.592.9801 Facsimile Number
mark.craige@crowedunlevy.com
michael.pacewicz@crowedunlevy.com

and

William H. Hoch, OBA # 15788
Braniff Building
324 North Robinson Avenue, Suite 100
Oklahoma City, Oklahoma 73102
(405) 235-7700 Telephone Number
(405) 239-6651 Facsimile Number
will.hoch@crowedunlevy.com

PROPOSED COUNSEL FOR DEBTORS

2610375.6

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Texoma Peanut Company | ) Case No. 14-81334 |
| Clint-Co Peanut Company | ) Case No. 14-81335 |
| Clint Williams Company-Western Division LLC | ) Case No. 14-81336 |
| Debtors. | ) |
| | ) Jointly Administered |

## DECLARATION OF MARY L. BURKE IN SUPPORT OF DEBTORS' APPLICATION TO EMPLOY AND RETAIN LAKESHORE FOOD ADVISORS, LLC AS THEIR SALE ADVISOR PURSUANT TO SECTIONS 327 AND 328(a) OF THE BANKRUPTCY CODE

I, Mary L. Burke, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a partner with Lakeshore Food Advisors, LLC ("Lakeshore"), which maintains an office at 20 North Wacker Drive, Suite 1701, Chicago, Illinois 60606.  I submit this declaration pursuant to Fed. R. Bankr. P. 2014 in support of the Debtors' Application to Employ and Retain Lakeshore Food Advisors, LLC as Their Sale Advisor Pursuant to Sections 327 and 328(a) of the Bankruptcy Code[1] ("Application") filed contemporaneously with this declaration by the above-captioned debtors-in-possession ("Debtors") in these chapter 11 cases. Except as otherwise indicated, I have personal knowledge of the matters set forth below and, if called as a witness, would testify competently thereto.

## QUALIFICATIONS

2.      Lakeshore is well qualified to assist the Debtors in this matter.  Lakeshore has considerable experience in providing services to financially troubled companies in the food and agribusiness industry.  Lakeshore provides a full range of investment banking and financial

---

[1] All references to sections or codes, unless otherwise noted, are made to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and referred to herein as the "Bankruptcy Code."

advisory services to such companies including mergers and acquisitions; raising capital, debt and equity; valuation work; and restructuring and bankruptcy.

3.    Lakeshore and its professionals have extensive experience providing financial advisory and investment banking services to financially distressed food and agribusiness companies and to creditors, equity holders, asset purchasers, and other constituents in reorganization proceedings and complex financial restructurings, both in and out of court.

4.    Lakeshore was initially retained by Debtors on or about August 15, 2014 to provide various financial and consulting services including assisting the Debtors evaluate the Debtors' businesses for potential sale as going concerns and identifying potential purchasers. Lakeshore obtained a detailed familiarity with the Debtors' business, capital structure, and financial affairs and played a significant role in the Debtors' prepetition restructuring efforts and preparation of these cases.   As such, Lakeshore has the necessary breadth and depth of institutional knowledge that has made and will continue to make this engagement more efficient and effective.

### SERVICES TO BE RENDERED

5.    As further set forth in the Financial Advisory Services Agreement,[2] dated August 15, 2014 (as may be amended, "Services Agreement"), if the Application is approved, the professional services Lakeshore may render to Debtors may include, without limitation, the following:

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Financial Advisory Services Agreement.

2

A.     Assist and advise Debtors in developing a strategy for accomplishing the sale of Debtors' peanut processing business and related operations.

B.     Advise Debtors in developing a list of prospective Buyers after considering the qualitative and quantitative characteristics of such parties and evaluating each such party against the strategic and financial objectives of the Debtors.

C.     Assist Debtors in preparing an information packet for distribution to prospective Buyers.

D.     Contact prospective Buyers.

E.     Provide Debtors with written progress reports regarding the status of the Transaction.

F.     Facilitate and respond to questions raised by prospective Buyers.

G.     Assist Debtors in reviewing, preparing and presenting information and attend meetings and conference calls with prospective Buyers.

H.     Coordinate and supervise due diligence by prospective Buyers.

I.     Assist Debtors in evaluating proposals from prospective Buyers.

J.     Assist Debtors in reviewing, structuring, negotiating, and executing all Transaction related agreements with prospective Buyers.

K.     Assist Debtors in closing the Transaction.

3

2616047.4

6.     Such professional services are necessary in the ongoing operation and management of the Debtors' business and assets as well as to the Debtors' restructuring efforts under chapter 11 of the Bankruptcy Code.

7.     The Debtors believe that Lakeshore is well qualified to provide services as sale advisor to the Debtors in a cost-effective, efficient and timely manner.  Lakeshore has indicated a willingness to subject itself to the jurisdiction and supervision of the Court.

## DISINTERESTEDNESS

8.     To the best of my knowledge, information and belief, based on and other than as set forth in this declaration, Lakeshore does not hold or represent an interest adverse to the Debtors' estates and is a "disinterested person," as that term is defined in § 101(14) and modified by § 1107(b), with respect to the matters for which it is to be retained.

9.     To the best of my knowledge, information and belief, except as set forth in this declaration, Lakeshore (a) has no connection with the Debtors, their creditors, equity security holders, or other parties-in-interest or their respective attorneys or accountants, the United States Trustee for the Eastern District of Oklahoma ("U.S. Trustee"), or any person employed in the office of the  U.S. Trustee in any matter related to the Debtors or their estates, (b) does not hold any interest adverse to the Debtors' estates and (c) believes that it is a "disinterested person" as that term is defined in section 101(4), as modified by section 1107(b) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code

4

10.     To the best of my knowledge, information and belief, based on and other than as set forth in this declaration, the disclosures made herein satisfy the requirements of Bankruptcy Rule 2014.

11.     Lakeshore has identified the following connections with potential parties-in-interest to these bankruptcy cases: Lakeshore performed services for the Debtors (and received payments on account of such services) prior to the filing of these chapter 11 cases as described more fully below.

12.     To the best of my knowledge, information and belief, neither Lakeshore nor any person employed by Lakeshore is a creditor, insider, or equity security holder of the Debtors.

13.     To the best of my knowledge, information and belief, neither Lakeshore nor any person employed by Lakeshore is or was, within two years before the filing of these chapter 11 cases, a director, officer or employee of the Debtors.

14.     To the best of my knowledge, information and belief, Lakeshore does not have an interest materially adverse to the interests of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or for any other reason.

15.     To the best of my knowledge, information and belief, and in view of the foregoing, Lakeshore is a "disinterested person" within the meaning of § 101(14).

**COMPENSATION**

5

16.     Subject to the Court's approval, Debtors will compensate Lakeshore in accordance with the terms and conditions and at the times set forth in the Services Agreement, which provides in relevant part for the following compensation structure ("Fee Structure"):

A.     Debtors paid Lakeshore a non-refundable fee of $125,000.00 upon execution of the Services Agreement.

A.     Debtors have agreed to pay Lakeshore a Success Fee according to the terms set forth in the Services Agreement.

B.     Debtors have agreed to pay Lakeshore a DIP Success Fee in the event Lakeshore provides DIP Financing Services in connection with these chapter 11 cases according to the terms set forth in the Services Agreement.

C.     Debtors have agreed to pay Lakeshore a Tail Fee according to the terms set forth in the Services Agreement.

17.     Debtors have agreed to reimburse Lakeshore on a monthly basis for all reasonable expenses incurred in connection with providing the services set forth in the Services Agreement. Such reimbursement shall be made pursuant to the terms of an order of the Court approving interim compensation procedures for professionals and pursuant to other orders of the Court.

18.     Debtors believe that the Fee Structure is comparable to compensation generally charged by investment banking and financial advisory firms of similar stature to Lakeshore for comparable engagements, both in and out of bankruptcy. Debtors believe that the Fee Structure is consistent with Lakeshore's normal and customary billing practices for cases of comparable

6

size and complexity that require the level and scope of services to be provided in these chapter 11 cases.

19.     Within the one (1) year prior to the filing of these chapter 11 cases, Lakeshore received payments totaling $134,334.04 (all of which was paid on or within ninety (90) days before the filing of these bankruptcy cases and of which $125,000.00 was the initial retainer and the remainder was fees and expenses) on account of, among other things, fees and expenses in connection with prepetition services rendered to the Debtors by Lakeshore. The payments for the prepetition fees and expenses billed under the Services Agreement were paid by Texoma Peanut Company, in the amount of $134,334.04 and the initial retainer of $125,000.00 was paid by Texoma Peanut Company.

20.     After deducting all fees and expenses previously billed for prepetition services rendered to the Debtors by Lakeshore from the amount that has been paid to Lakeshore, the retainer has been exhausted.

21.     Pursuant to the Services Agreement, Lakeshore will not receive any additional amounts from the Debtors to supplement the retainer.

22.     As of the date of the filing of these chapter 11 cases, Lakeshore had been compensated for all known fees and reimbursed for all known expenses incurred through a combination of the payments identified above or application of the retainer.

23.     Lakeshore will provide the Debtors with periodic (no less than monthly) invoices for services rendered and disbursements incurred. During the course of these cases, the issuance of periodic invoices will constitute requests for interim payment against the total reasonable fees

7

and reimbursable expenses to be determined at the conclusion of these cases. Interim and final payments are to be made on account of such invoices only in accordance with orders of the Court.

24.     In addition to the fees set forth in the Fee Structure, Lakeshore will charge the Debtors for all out of pocket expenses and other charges incurred in respect of this engagement. Generally, these expenses and charges will include, among other things, telephone charges, photocopying, travel, business meals, messengers, couriers, postage, witness fees and other fees related to trials and hearings.

25.     Lakeshore intends to apply to the Court for allowance of compensation for professional services rendered and reimbursement of charges and disbursements incurred in these cases in accordance with and subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Eastern District of Oklahoma, and the orders of this Court.

26.     Other than as set forth above and in the Services Agreement, no arrangement is proposed between the Debtors and Lakeshore for compensation to be paid in these Cases.

Dated November 13, 2014.

Mary L. Burke

8



20 North Wacker Drive
Suite 1701
Chicago, IL 60606
(312) 348-7080
(312) 376-1585

## FINANCIAL ADVISORY SERVICES AGREEMENT

THIS AGREEMENT ("Agreement"), dated August 15, 2014, confirms that TEXOMA PEANUT COMPANY, an Oklahoma corporation, having its principal place of business at 433 East Main Street, Madill, OK 73446 its subsidiaries and affiliates ("Client") has retained LAKESHORE FOOD ADVISORS, LLC, an Illinois registered limited liability company with its principal offices at 20 North Wacker Drive, Suite 1701, Chicago, IL 60606 ("LFA"), for the purposes described in this Agreement in accordance with the terms and conditions specified herein, and LFA has agreed to such engagement.

1. **Purpose of Engagement.** LFA will render strategic and financial advisory services (the "Services") as outlined below to Client in connection with the possible sale to one or more third parties (the "Buyer(s)") of Client's peanut processing business and related operations (the "Transaction"). Among other Services, LFA will:

   - Assist and advise Client in developing a strategy for accomplishing the Transaction(s).

   - Advise Client in developing a list of prospective Buyer(s) (the "Transaction Call List") after considering the qualitative and quantitative characteristics of these parties and evaluating each party against the strategic and financial objectives of Client. No party will be placed on the Transaction Call list or contacted by LFA without Client's prior approval (which approval may be withheld in Client's sole discretion) and without LFA causing such third-party to execute a confidentiality agreement approved by Client.

   - Assist Client in preparing an information package for distribution to prospective Buyer(s) describing Client's business, its operations, facilities, financial condition and prospects.

   - Contact prospective Buyer(s).

   - Provide Client with written progress reports regarding the status of the Transaction(s).

   - Facilitate and respond to questions raised by prospective Buyer(s).

   - Assist Client in reviewing, preparing and presenting requested information and attend meetings and conference calls with prospective Buyer(s).

   - Coordinate and supervise due diligence (including inspections) by prospective Buyer(s).

   - Assist Client in evaluating proposals from prospective Buyer(s).

   - Assist Client in reviewing, structuring, negotiating and executing all Transaction related agreements with prospective Buyer(s).

   - Assist Client in closing the Transaction(s).

In addition to the above services, at Client's request LFA will provide the following services related to Client's financing in bankruptcy (the "DIP Financing Services")

- Assist Client in obtaining the necessary Debtor in Possession Financing ("DIP Financing") from its existing lender(s) or new lender(s) to fund the business through the date of a successful Transaction.

2. **Period of Engagement.** LFA's engagement under this Agreement will commence on the date written above and expire one (1) year later. Notwithstanding the foregoing, this Agreement may be terminated by either party at any time, with or without cause, upon ten (10) days written notice to that effect to the other party.

3. **LFA's Compensation.** Client will pay to LFA the following sums:

   (a) **Work Fee.** Client will pay to LFA a non-refundable fee (the "Work Fee") of one hundred twenty five thousand dollars ($125,000) upon the execution of this Agreement.

   (b) **Success Fees.** Contingent upon the successful closing of a consensual sale Transaction during the term of this Agreement or in the event a Transaction occurs or is effected through the agency of another person and the Tail Fee (as defined below in subparagraph 3(d)) is due and owing, Client will pay LFA a cash payment (the "Consensual Sale Success Fee") equal to (i) six hundred thousand dollars ($600,000) plus three percent (3.0%) of Total Consideration in excess of the sum of Client's inventory value and accounts receivable value on the closing date if a Transaction is completed with any other Buyer other than Birdsong Peanuts, or (ii) six hundred thousand dollars ($600,000) plus one and one half percent (1.5%) of Total Consideration in excess of the sum of Client's inventory value and accounts receivable value on the closing date if a Transaction is completed with Birdsong Peanuts. However, if a consensual sale Transaction is closed and funded with Birdsong Peanuts:

   - on or before September 30, 2014, no Consensual Sale Success Fee will be due on that Transaction; or

   - after September 30, 2014, but on or before October 7, 2014, LFA shall be entitled to twenty five percent (25%) of its Consensual Sale Success Fee on that Transaction; or

   - after October 7, 2014, but on or before October 14, 2014, LFA shall be entitled to fifty percent (50%) of its Consensual Sale Success Fee on that Transaction; or

   - after October 14, 2014, but on or before October 21, 2014, LFA shall be entitled to seventy five percent (75%) of its Consensual Sale Success Fee on that Transaction; or

   Contingent upon the successful closing of a Transaction as part of a 363 bankruptcy sale during the term of this Agreement or in the event a Transaction occurs or is effected through the agency of another person and the Tail Fee (as defined below in subparagraph 3(d)) is due and owing, Client will pay LFA a cash payment (the "363 Sale Success Fee") equal to six hundred thousand ($600,000) plus three percent (3.0%) of Total Consideration in excess of the sum of Client's inventory value and accounts receivable value on the closing date.

<u>For an "equity" (or stock) transaction:</u> Total Consideration equals (i) the total amount of Consideration paid to Client and/or its shareholders for the stock sold, plus (ii) any liabilities assumed by the Buyer, plus (iii) the present value of the lease payments (based on discount rate equal to the then prevailing prime rate as quoted in the The Wall Street Journal) if any owned real estate is retained by the shareholders and leased back to the Buyer.

<u>For an "asset" transaction:</u> Total Consideration equals (i) the total amount of Consideration paid to Client and/or its shareholders for the assets sold, plus (ii) any liabilities assumed by the Buyer, plus (iii) the present value of the lease payments (based on discount rate equal to the then prevailing prime rate as quoted in the The Wall Street Journal) if any owned real estate is retained by the shareholders and leased back to the Buyer.

For the purpose of calculating Total Consideration, future payments to be made to Client or its shareholders in connection with the Transaction, including payments that are contingent on future events, such as, without limitation, the post-closing earnings or operations of the business, will be valued based on the present value of the reasonably expected maximum amount of such contingent payments based on Client projections or, in the absence of projections, as determined in good faith by Client and LFA, utilizing a per annum discount rate equal to the then prevailing prime rate as quoted in The Wall Street Journal.

Consideration includes cash, securities, deferred monies, consulting and or non-compete payments, and assets retained by Client or distributed to its shareholders as part of the Transaction.

In addition, if a Transaction for which LFA would have been entitled to a Success Fee is not consummated and Client or its shareholders receive a "termination," "break-up," "topping" or other similar fee or option, Client will pay LFA an amount equal to one quarter (25%) of any such fee or value of any such option but in any event no more than LFA would have received had the Transaction been consummated.

Any cash fees due under this paragraph shall be paid to LFA in readily available funds on the day the closing of any Transaction occurs. Any paid Work Fee will be credited against any Success Fee due and owing.

(c) **DIP Success Fee.** In the event that Client files for bankruptcy protection as part of a sale or restructuring process, and Client elects to have LFA provide DIP Financing Services, Client will pay to LFA a success fee (the "DIP Success Fee") equal to one percent (1.0%) of the total DIP Financing commitment on the day the DIP Financing closes.

(d) **Tail Fee.** The period commencing on the expiration or earlier termination date of this Agreement and expiring twelve (12) months thereafter is referred to herein as the "Tail Period." LFA shall be entitled to its full fees under Section 3(d) hereof in the event that a Transaction is consummated at any time prior to the expiration the Tail Period, or letter of intent or a definitive agreement with respect to a Transaction is executed at any time prior to the expiration of the Tail Period (which letter of intent or definitive agreement subsequently results in the consummation of a Transaction (the "Tail Fee"). However, to qualify for the Tail Fee, (i) such third party must have been included on LFA's Transaction Call List, (ii) such third party must have been actually contacted by LFA

during the term of this Agreement and (iii) LFA must have documented such contact in its regular written progress report to Client. Any monies owed under this Tail Fee provision shall be paid to LFA in readily available funds on the day the Transaction closes.

4. **Reimbursement of Expenses.** In addition to any fees that may be payable to LFA and regardless of whether any Transaction is proposed or consummated, Client will reimburse LFA on a monthly basis for all reasonable disbursements incurred in connection with any actual or proposed Transaction or otherwise arising out of LFA's engagement, including all travel and production costs. Client will remain liable for reimbursement of out-of-pocket expenses incurred by LFA in the course of providing Services, including out-of-pocket expenses incurred at Client's request after termination or expiration of this Agreement.

5. **Announcement.** At the conclusion of the Transaction LFA reserves the right to publish an announcement of its role as Client's financial and strategic advisor with respect to this engagement. In addition, if Client issues a press release regarding the Transaction(s), a reference will be made to LFA's role as Client's advisor.

The parties have caused this Agreement to be executed by their duly authorized representatives as of the Date written above.

Engagement terms including attached Exhibit A, Standard Terms and Conditions accepted by:

TEXOMA PEANUT COMPANY                    LAKESHORE FOOD ADVISORS, LLC

By: _____             By: _____
Name: ALAN L. ORLOFF                     Name: Mary L. Burke
Title: PRESIDENT                         Title: Partner


LAKESHORE FOOD ADVISORS, LLC

By: _____
Name: Philip A. Zofoto
Title: Partner

## EXHIBIT A
### STANDARD TERMS AND CONDITIONS

1. **Accuracy of Client Data.** Client recognizes and confirms that in performing its duties pursuant to this Agreement, LFA will be using and relying on data, material and other information (the "Information") furnished by Client and its employees and representatives and on information available from generally recognized public sources without any independent investigation or verification thereof. Accordingly, LFA assumes no responsibility for the accuracy and completeness of the Information. In rendering its Services hereunder, LFA will not make an appraisal or independent valuation of any of the assets or liabilities of Client. Client agrees that any Services will be based entirely upon Information supplied by Client or available from public sources. Client will exercise reasonable care to ensure that Information is complete and accurate in all material respects, and not materially misleading, and Client will be solely responsible for the accuracy and completeness of any such Information used, summarized or presented in any Services. Without limiting the foregoing, LFA will be neither responsible for nor liable to any party for any representations, assertions or statements based on the Information or reasonably derived therefrom if such representations, assertions or statements prove to be false, inaccurate, deceptive, misleading or incomplete.

2. **Confidentiality.** Unless required by law or applicable legal process, any advice rendered by LFA pursuant to this Agreement may not be disclosed publicly by LFA or Client without the other party's prior written consent or used for any purposes not related to Client's participation in the Services.

3. **Confidential and Proprietary Information.** "Confidential and Proprietary Information" means all documents, software, reports, data, records, forms and other material (a) obtained by LFA from Client in the course of performing the Services: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by Client to LFA; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential or (b) developed or prepared by LFA based upon information described in (a). Confidential and Proprietary Information does not include information which: (i) is already known to LFA at the time of disclosure by Client; (ii) is or becomes publicly known through no wrongful act of LFA; (iii) is independently developed by LFA without benefit of Client's Confidential and Proprietary Information; or (iv) is received by LFA from a third

party without restriction and without a breach of an obligation of confidentiality. All Confidential and Proprietary Information of Client remains the property of Client and will be maintained in confidence by LFA, will not be used by LFA for any purpose other than to provide the Services under this Agreement, and will not be disclosed to any third party, except as provided herein, without Client's prior written consent, unless required by applicable law or legal process. At the conclusion of the Services, LFA will, upon Client's request, return to Client all Confidential and Proprietary Information of Client in its possession or, upon Client's request, LFA will destroy all Confidential and Proprietary Information of Client in its possession, subject to LFA's need to preserve its interests hereunder. Upon written request by Client, LFA will certify the destruction of all Confidential and Proprietary Information of Client, clearly identifying any such information retained by LFA as necessary to preserve its interests hereunder. The confidentiality restrictions and obligations imposed by this section will terminate two (2) years after the expiration or termination of this Agreement.

4. **Limitations on Use.** Client expressly acknowledges that all information and advice provided by LFA to Client in connection with LFA's engagement are intended solely for the benefit and use of Client (including its management, directors, shareholders and attorneys) in considering the Services to which they relate, and Client agrees that, except as required by law, no such information or advice will be used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor will any public reference to LFA be made by Client (or such persons) without the prior written consent of LFA, which will not be unreasonably withheld. Client specifically agrees, without limiting the generality of the foregoing, that it will not use any information or advice provided by LFA to Client in any tax matter, proceeding or audit nor in any matter having to do with the listing or public sale of securities unless LFA has agreed to such use beforehand, in writing.

5. **Indemnification of LFA.**
(a) In the event of a claim by a third party relating to services under the Agreement to which these Standard Terms and Conditions are attached, Client will indemnify LFA and its personnel from all such claims, liabilities, costs and expenses, except to the

extent determined to have resulted from the intentional or deliberate misconduct by LFA.

(b) LFA will have no liability to Client for any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the services performed hereunder for an aggregate amount in excess of the fees paid by Client to LFA under this Agreement. In no event shall LFA be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss, whether in contract, statute, tort (including, without limitation, negligence) or otherwise.

(c) In the event any third party asserts a claim against LFA or its personnel for which a right of indemnification is asserted under subparagraph (a) above, Client shall, at its choice, either engage counsel to defend LFA and/or its personnel or shall be responsible for the current payment of costs and expenses LFA and/or its personnel incur to defend against such claim.

6. **Independent Contractor.** Nothing in this Agreement will be deemed to constitute LFA or Client the agent of the other. Neither LFA nor Client be or become liable or bound by any representation, act or omission whatsoever of the other.

7. **Not a Registered Broker-Dealer.** LFA is not a registered broker-dealer and will not be providing services to Client as a broker-dealer. All services provided by LFA will be strictly as an advisor to Client.

8. **Nonassignability.** This Agreement and all rights, liabilities and obligations hereunder will be binding upon and inure to the benefit of each party's successors, but neither party will assign, transfer or subcontract this Agreement or any of its obligations hereunder without the other party's express, prior written consent.

9. **Severability.** In the event that any term or provision of this Agreement is held to be invalid, void or unenforceable, then the remainder of this Agreement will not be affected, impaired or invalidated, and each such term and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

10. **Governing Law.** Regardless of the place of execution or performance, this Agreement and any related indemnification and confidentiality agreements between the parties will be deemed made in Illinois. All actions arising hereunder or in connection herewith will fall under the exclusive jurisdiction and venue of the United States District Court for the Northern District of Illinois, and each of the parties hereto hereby agrees to the personal jurisdiction and venue of said court. The parties hereto agree to service of process by certified mail or receipted courier. Any right to trial by jury with respect to any claim or proceeding related to or arising out of this engagement, or any transaction or conduct in connection herewith, is waived.

11. **Integration.** This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior and contemporaneous representations, proposals, discussions, and communications, whether oral or in writing. This Agreement may be modified only in writing and will be enforceable in accordance with its terms when signed by each of the parties hereto.

12. **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which constitute one and the same instrument.

13. **Third Party Beneficiaries.** This Agreement is made solely for the benefit of Client, LFA, other Indemnified Parties and their respective successors and assigns, and no other person will acquire or have any right under or by virtue of this Agreement.

14. **No Conflict of Interest.** Client recognizes that LFA may from time to time throughout the term of this Agreement provide services to companies that are in competition with Client. Client hereby agrees that this Agreement does not limit LFA's ability to provide such services, and that LFA's provision of such services does not represent a breach of this Agreement or represent a conflict of interest for LFA in the context of this Agreement. This paragraph does not limit LFA's confidentiality obligations under paragraph 2 of this Agreement.

15. **Notices.** All notices, requests and demands hereunder will be in writing and will be deemed to have been duly given (a) upon personal delivery, (b) five (5) days after being mailed by registered or certified mail, return receipt requested or (c) one (1) business day after being sent by nationally recognized overnight courier.